**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **FRANK DEBARTOLO,** | : |
| | : |
| **Plaintiff** | :   **CIVIL ACTION NO. 3:12-2438** |
| | : |
| **v.** | : |
| | :     **(JUDGE MANNION)** |
| **CAROLYN COLVIN,**[1] | |
| **Acting Commissioner of the** | : |
| **Social Security Administration** | : |
| | : |
| **Defendant** | : |

# M E M O R A N D U M

Frank DeBartolo is a survivor of September 11, 2001 attack on the World Trade Center in New York City, more commonly referred to as "the 9/11 attacks." After living through those traumatic events, he struggled to maintain work for the next ten years. He did not work a full five-day week from September 2001 through his alleged onset date of June 4, 2010, despite numerous accommodations by his previous employer. Between July 2010 and March 2012, Mr. DeBartolo was treated by Dr. Bruce Snyder, MD, a licensed psychologist. During their weekly meetings, Dr. Snyder catalogued and recorded Mr. DeBartolo's continuing struggles with post traumatic stress disorder (PTSD) and depressive disorder, not otherwise specified. The

---

[1]On February 14, 2013, Carolyn Colvin became acting Commissioner of the Social Security Administration. Pursuant to Fed.R.Civ.P. 25(d), she has been substituted as the defendant.

plaintiff suffered from symptoms such as depression, preoccupied thoughts, anxiety, impaired memory, and poor social judgment. He also discussed conflicts with his wife and children that sprung from his continued psychological struggles.

Mr. DeBartolo applied for Social Security disability insurance benefits (DIB) alleging he became disabled on June 4, 2010. After submitting evidence to and testifying before an Administrative Law Judge (ALJ), he was only awarded benefits starting on September 22, 2011. He now appeals that unfavorable portion of the ALJ's decision. The court finds the ALJ improperly weighed the medical evidence of record with regard to the plaintiff's severe mental impairments. The ALJ's decision is therefore unsupported by substantial evidence of record. There is abundant evidence that establishes Mr. DeBartolo had marked limitations in both his activities of daily living and his abilities to maintain concentration, persistence, and pace. As such, the court finds that Mr. DeBartolo became disabled on June 4, 2010 and reverses the ALJ's decision. The court will direct the Commissioner of Social Security to award DIB from June 4, 2010.

## I.    PROCEDURAL BACKGROUND

The record in this action, (Doc. 7), has been reviewed pursuant to 42 U.S.C. §405(g) to determine whether there is substantial evidence to support the Commissioner's decision denying the plaintiff's claim for Disability

Insurance Benefits ("DIB") under the Social Security Act, ("Act"). 42 U.S.C. §§401-433, 1381-1383f. The plaintiff, Frank DeBartolo, filed his initial application for DIB on May 4, 2011. (TR. 197). That application was denied six weeks later and the plaintiff requested a hearing before an ALJ. (TR. 114-119). The ALJ conducted a hearing on April 2, 2012 where she took testimony from the plaintiff and a vocational expert. (TR. 44). On July 24, 2012, the ALJ issued a decision finding the plaintiff became disabled on September 22, 2011. The ALJ denied the plaintiff's request for benefits between June 4, 2010 and September 22, 2011. (TR. 21-43). The plaintiff requested review by the Appeals Council, but they denied his request, thereby making the ALJ's decision the final determination of the Commissioner. (TR. 1-6).

The plaintiff filed his complaint challenging the ALJ's determinations and findings on December 6, 2012. (Doc. 1). He filed his brief in June 2013, (Doc. 12), and the defendant filed her brief on July 12, 2013. (Doc. 13). The plaintiff subsequently filed a reply brief. (Doc. 14). The case is now ripe for the court's ruling.

## II.    STANDARD OF REVIEW

When reviewing the denial of disability benefits, the court must determine whether the denial is supported by substantial evidence. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988); *Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence "does not

mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552 (1988); *Hartranft v. Apfel,* 181 F.3d 358, 360. (3d Cir. 1999), *Johnson,* 529 F.3d at 200. It is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if her physical or mental impairment or impairments are of such severity that she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which she lives, or whether a specific job vacancy exists for her, or whether she would be hired if she applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §423(d)(2)(A).

## III.   DISABILITY DETERMINATION PROCESS

A five-step process is required to determine if an applicant is disabled under the Act. The Commissioner must sequentially determine: (1) whether the

applicant is engaged in substantial gainful activity; (2) whether the applicant has a severe impairment; (3) whether the applicant's impairment meets or equals a listed impairment; (4) whether the applicant's impairment prevents the applicant from doing past relevant work, and; (5) whether the applicant's impairment prevents the applicant from doing any other work. 20 C.F.R. §§404.1520, 416.920.

Here, the ALJ determined that claimant has severe impairments including Post Traumatic Stress Disorder (PTSD), depressive disorder not otherwise specified, chronic obstructive pulmonary disease (COPD), asthma, arthralgia, myalgia and myositis, and fibromyalgia. The ALJ concluded the plaintiff was not disabled for the period between June 4, 2010 and September 22, 2011 and retained the residual functional capacity ("RFC") to perform light, unskilled work, with certain nonexertional limitations, and that therefore he was not disabled for that period of time under 20 C.F.R. §404.1520(g). However, the ALJ further concluded that as of September 22, 2011, the plaintiff became disabled. (Tr. 28-39).

## IV.   THE ALJ'S DECISION

Using the above-outlined procedure, the ALJ found that plaintiff met the insured status requirements of the Act through December 31, 2015, and that plaintiff had not engaged in substantial gainful activity since June 4, 2010, the alleged onset date. The ALJ found that plaintiff has severe impairments noted

above, but that between June 4, 2010 and September 22, 2011, the plaintiff did not have an impairment or combination of impairments which met or medically equaled the severity of the listed impairments of 20 C.F.R. Part 404, Subpart B, Appendix 1. The ALJ found that the plaintiff had the RFC to perform light work, with the nonexertional limitations that the work be unskilled, consist of simple, routine, repetitive tasks with only occasional changes in work setting, involve only occasional interaction with supervisors, co-workers, and the public. The plaintiff was further limited to only occasional balancing, bending, stooping, crouching, crawling, kneeling, climbing, and pushing/pulling with his lower extremities. Finally, the plaintiff should avoid concentrated exposure to temperature extremes, humidity, wetness, fumes, odors, dust, gases and poor ventilation, vibrations, and hazards such as moving machinery and unprotected heights.

The ALJ also determined that plaintiff has no past relevant work experience, that he was born on February 12, 1959, and was 53 years old as of the date of the decision, making him a "person closely approaching advanced age" under 20 C.F.R. §404.1563. The ALJ additionally found that plaintiff has a high school education and can communicate in English, that transferability of his job skills is not an issue because he does not have past relevant work experience, that jobs which he can perform exist in significant numbers in the national economy, and that he was not disabled as defined by the Act from June 4, 2010 through September 22, 2011, but became disabled

as of that latter date. (Tr. 28-39).

## V.    EVIDENCE OF RECORD

The plaintiff has a high school education with two years of college, and previously worked as a chief of communications and project manager for the New York City municipal government. (Tr. 89, 226). He lives with his wife, who does not work due to disability, and two teenage sons, ages sixteen and eighteen. (Tr. 49). He claims he could not work starting on June 4, 2010 because he was suffering from physical pain and mental/emotional distress. Before that, he worked continuously for 33 years. (TR. 70). Many of his problems stem from his involvement in the 9/11 attacks in New York City. (TR. 35).

The plaintiff testified before the ALJ and gave details about his limitations. He noted that he used to help with chores around the house, but cannot do so any longer. He has issues with concentration and memory, especially remembering events that just happened. He also used to be an avid reader, but can no longer read for work or pleasure. (Tr. 61). When his sons were younger he was involved in the boy scouts and was a scout master, but stopped participating years ago. (TR. 62). He also does not have any hobbies.

Before he stopped working, his former employer allowed him to keep a cot in his office so he could rest and recover during the workday when needed. (Tr. 73). Between September 11, 2011 and the date of the alleged onset, the

plaintiff did not work a full five-day week. He was forced to use his vacation and sick time to compensate for his missed work. (Tr. 53). He would take long weekends to try and recover from the pain caused by headaches and breathing problems. (Tr. 72).

Starting on July 1, 2010, he was treated by Dr. Bruce E. Snyder, M.S., a treating licensed psychologist. (TR. 387).  Dr. Snyder notes indicate the plaintiff was feeling regretful, slept approximately 5 hours per night, and was having dreams about the 9/11 attacks. He was also easily startled by planes and construction. Dr. Snyder's notes are extensive and encompass seventy-two weekly meetings that occurred over the span of approximately seventeen months. In his decision, the ALJ selectively pointed to eleven of those sessions starting on April 7, 2011 and ending on April 15, 2012, but failed to address or even discuss the other 61 appointments.

The July 2010 sessions include notations indicating the plaintiff was anxious and stressed.[2] He was having dreams and vivid memories of the 9/11 attacks. He was also tearful when speaking about these thoughts, claiming that similar situations bring the emotions flooding back. The notes from the following month show a similar pattern of anxiety, recurring dreams, and stress. He reported two incidents where he "flipped out" at work. His home life continued to be stressed as his physical and mental problems continued to overwhelm

---

[2]The court summarizes the sessions not discussed by the ALJ to give a full background into Dr. Snyder's treatment.

him. He showed signs of depression and anxiety and reported feeling like he was "not with it." (TR. 409-412).

In September 2010, the plaintiff had a rough time dealing with the ninth anniversary of the 9/11 attacks. He stated that he was feeling slightly more energized, but was still stressed and anxious about his inability to work. He claimed that he took some photographs in order to relax, but felt he was forcing himself to do it rather than doing it for pleasure. At the end of the month, he felt like he was in a fog, was easily confused, and was thinking slowly. Although Dr. Snyder noted the plaintiff was more "optimistic," he also found the plaintiff exhibited signs of anger, guilt, anxiety, and hypervigilance. October 2010 saw the plaintiff struggle with blaming himself and guilt over the 9/11 attacks. He had difficulties accepting his mental and physical state, asking questions like "What happened to me?". By the end of the month, Dr. Snyder stated that the plaintiff had more energy and his mood had improved. (TR. 408-9).

The November and December 2010 notes[3] indicate the plaintiff continued to suffer from depression and anxiety. Dr. Snyder further found that the plaintiff had ongoing stress stemming from his worsening physical and mental condition. These conditions were also affecting his family relationships. By the end of December, however, the plaintiff was more alert and better rested

_____

[3]Dr. Snyder's notes are not entirely clear as they were hand-written and copied into the record. The court has thoroughly reviewed them in order to ensure accuracy with the doctor's findings.

as a result of his medication and drinking coffee in the morning. However, the first weeks of January 2011 saw his condition worsen. He displayed significant anger and frustration stemming from his responsibilities during 9/11 and with the United States Air Force. Specifically, during the January 23, 2011 session the plaintiff cried and yelled, becoming so agitated that Dr. Snyder had to calm him down. Despite his "improving mood," the doctor noted he "remains very fragile, physically and mentally." (TR. 406-7).

The plaintiff continued to struggle into February and March 2011. His emotional distress affected his relationship with his family, specifically his two sons who he found to be irresponsible and difficult to discipline. He was also tense, anxious, and fearful during most of his February sessions. He experienced disorganized thought patterns at the end of that month. In March, he expressed great concern about a return trip to Brooklyn and Dr. Snyder helped him plan a route that would avoid the 9/11 site. In the middle of March, he was denied disability benefits from another entity, leading to feelings of helplessness and general distress. At the end of March, he was depressed and "tortured" by physical pain. He blamed the government for his situation and was seeking legal advice on how to proceed. (TR. 403-4).

None of these previously outlined sessions were discussed by the ALJ. During his first session in April 2011, the plaintiff felt better and stated that drinking coffee helped alleviate his pain. However, the follow-up sessions that same month showed a resurgence of his anger and frustration, along with a

need to vent. He further noted feeling pressures and being betrayed by his employer. In May 2011, he reported that he was upset and stayed up all night obsessing over some information from the government. This suspicion spilled over to his next few sessions as he continued to feel betrayed by the government and suspicious of its actions. Dr. Snyder noted the plaintiff had rapid and pressured speech when talking about 9/11, world events, and politics. (Tr. 401-4).

During the June 2, 2011 session, the plaintiff reported fighting with his wife about finances and health problems. He also showed signs of memory and focus issues as he had to used a GPS device to find Dr. Snyder's office, despite being treated at the same location for nearly a year. In mid-June, he reported helping his son with school and boy scout projects, but also noted continued preoccupation with his employment situation. Although on June 16 he showed "better spirits," the next session saw him struggle with depression, poor sleep, and hypervigilance. He also was fighting a plethora of bad memories. During his last session that month, he had difficulty thinking and processing his thoughts, despite having coffee beforehand. He also continued to show poor sleep patterns, depression, and anxiety into July 2011. His sessions in July saw him regress, as he appeared more depressed and overwhelmed. Dr. Snyder recommended he go to a local emergency room if he felt it was necessary. The plaintiff's depression continued through the end of that month, as he vented often and was frustrated at his loss of physical

functioning. (Tr. 399-401).

The plaintiff's struggles with his family and mental status continued into early August 2011. He fought with his wife frequently about finances and also was forced to register his son for school. Dr. Snyder observed him to be upset, anxious, depressed, and tearful during his first two sessions that month, but noted he was in better spirits on August 19, 2011. In his next two sessions, spanning into September 2011, the plaintiff continued to show frustration with his family and financial situation. During his appointment four days before the tenth anniversary of the 9/11 attacks, he was depressed, anxious, and tearful. Dr. Snyder characterized him as "fragile." During his last two September 2011 appointments, he exhibited increased energy and mood, but still appeared stressed and anxious. (TR. 397-99).

The plaintiff's condition continued to worsen through October 2011 as he experienced greater physical pain from his other health issues. Dr. Snyder noted at the end of the month that the plaintiff was overwhelmed during an evaluation and didn't know how to answer the questions posed to him. His home situation continued to deteriorate through November 2011. His sons were uncooperative and he felt his mother was interfering with his family life. In the middle of that month, he was denied disability and that increased his anger and depression. At the end of November, he and his wife were talking over each other and he characterized his home life as "total dysfunction." (TR. 396-97).

Starting in December 2011, the plaintiff became more positive, despite

little change in his family situation. Dr. Snyder noted that during December, the plaintiff had made very little progress and believed him to have a poor prognosis. This continued well into January 2012 as the plaintiff presented as "very depressed," despite participating well during these therapy sessions. Dr. Snyder, however, did see some progress starting in February 2012 and running into March of that same year, as he upgraded the plaintiff's progress and prognosis to "fair." (TR. 393-5).

On June 2, 2011, Dr. Snyder completed a mental findings summary. He opined that the plaintiff would be unable to complete full-time work and suffered from numerous psychological limitations. In terms of his supporting clinical findings, the doctor detailed the following observations to support his diagnoses: poor memory, perceptual disturbances, sleep disturbances, personality change, mood disturbances, social withdrawal or isolation, emotional liability, decreased energy, recurrent severe panic attacks, loss of interest, recurrent recollections of traumatic events, pressured speech, hostility, vigilance, mood disturbances, paranoia, guilt, and anxiety. (TR. 278). Turning to restrictions, Dr. Snyder found the following marked limitations: understanding and remembering simple and detailed instructions; carrying out detailed instructions; maintaining concentration for 2 hours; performing activities within a schedule; maintaining regular attendance; punctuality; sustaining an ordinary routine without supervision; working in proximity to others without being distracted by them; making simple work related decisions; and completing a

13

normal workweek without psychological interruptions. (TR. 280).

He further found that the plaintiff suffered marked restrictions in terms of responding appropriately to changes in work setting, traveling to unfamiliar places, and setting realistic goals independently. (TR. 281). He noted episodes of decompensation, marked restrictions in daily living, and difficulties with concentration, persistence, and pace. (Id.). He found the plaintiff only had moderate limitations in terms of social functioning. Lastly, he concluded the plaintiff was incapable of even "low stress" work and would have to miss work more than three times a month because of his anxiety, panic attacks, poor memory, and poor concentration. (TR. 282). Plaintiff received a Global Assessment of Functioning[4] ("GAF") score of 35. (TR. 277).

The plaintiff was also treated by Dr. Michael W. Spence, D.O., who was his treating physician between 2010 and the date of the ALJ's decision. During his September 23, 2011 check-up, the plaintiff was depressed. He was also easily distracted and his thought process demonstrated tangential thinking. These findings were consistent throughout his treatment with Dr. Spence, including follow-ups on October 24, 2011 where the plaintiff was again

---

[4]A GAF score, or a Global Assessment Functioning scale, takes into consideration psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness and is not supposed to include the consideration of impairment in functioning due to physical (or environmental) limitations. The scale ranges from the highest score of 100 to the lowest score of 1. A GAF of 31-40 indicates some impairment in reality testing or communication, *or* major impairment in several areas, such as work or school family relations, judgment, thinking, or mood.

depressed and tearful. Dr. Spence also noted the plaintiff was alert and oriented with intact memory during these encounters. (TR. 350-53). Further notes from February and March 2012 indicate the plaintiff was alert and oriented, had appropriate mood, and was attentive. (TR. 360-66).

## VI.   DISCUSSION

The plaintiff raises a host of arguments in his appeal to the court.[5] Although not raised first, he essentially argues that the ALJ erred in step 3 of the disability determination by finding that plaintiff does not have an impairment or combination of impairments that meets or medically equals the listing in 12.04B in 20 C.F.R. Part 404, Subpart P, Appendix 1. Plaintiff contends that the objective medical evidence of record, specifically the detailed and well-documented treatment notes and diagnoses of Dr. Snyder, establishes that plaintiff meets the requirements of listings in 12.04B. The parties do not appear to dispute that Dr. Snyder is a treating physician, so the central question is whether the ALJ assigned his opinions little weight based on other medical evidence. It is a threshold issue and the court will address it first.

A claimant bears the burden of establishing that his or her impairment

---

[5]The plaintiff makes additional arguments challenging the ALJ's evaluation of his physical ailments, the weighing medical evidence, and the hypothetical question posed to the vocational expert. (Doc. 1). Although those arguments appear to have merit, the court need not reach or address them given the discussion below.

meets or equals a listed impairment. *Young v. Comm. of Social Sec.*, 322 F.App'x 189,190 (3d Cir. 2009)(*citing Poulos v. Comm. of Social Sec.*, 474 F.3d 88, 91 (3d Cir. 2007)). To match a listed impairment under the regulations, a claimant's impairment must satisfy all of the criteria for the listing. 20 C.F.R. §404.1525(c)(3). If the claimant's impairment matches or equals a listed impairment, then she is disabled, and no further analysis is necessary. *Cunningham v. Comm. of Social Sec.*, 507 F.App'x 111, 115 (3d Cir. 2012)(*citing Brewster v. Heckler*, 786 F.2d 581, 584-84 (3d Cir. 1986)). The court considers symptoms, the extent to which those symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of the record. 20 C.F.R. §404.1529.The ALJ need not use particular language or a particular format at step 3, as long as the decision permits meaningful judicial review. *Ortega v. Comm. of Social Sec.*, 232 F.App'x 194, 197 (3d Cir. 2007)(citations omitted).

An ALJ "may properly accept some parts of the medical evidence and reject other parts, but she must consider all the evidence and give some reason for discounting the evidence she rejects." *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994)(citing *Stewart v. Secretary of H.E.W.*, 714 F.2d 287, 290 (3d Cir.1983)). When dealing with a treating physician, the ALJ must consider the evidence that supports that doctor's opinion and may reject it only on the basis of "contradictory medical evidence." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). The ALJ cannot rely on "his or her own credibility judgments,

speculation or lay opinion." *Id.* Moreover, it is inappropriate for an ALJ to merely root out and find the evidence that supports a finding of not disabled, while simultaneously ignoring or glossing over evidence that support's a finding of disabled. *See Colon v. Barnhart, 424 F.Supp.2d 805, 813 (E.D.Pa. 2006)*(finding that an ALJ is required to discuss his or her "discounting of probative record evidence").

In terms of evaluating the medical evidence, generally an ALJ will give more weight to a treating physician's opinion. 20 C.F.R. §404.1527(d)(2) provides in relevant part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

"An ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided." *Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999).* Where a treating physician has an opportunity to offer opinions based on continuous observations of the plaintiff's condition over an extended period of time, it should be properly considered unless there is contrary *medical evidence* contained in the record. *Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir. 1987)*(*citing Podedworny v. Harris, 745 F.2d 210, 217 (3d*

Cir.1984))(emphasis added).

The ALJ concluded that plaintiff suffers from several mental disorders, including Post Traumatic Stress Disorder (PTSD) and depressive disorder not otherwise specified. (Tr. 29). The ALJ considered these disorders under 20 C.F.R. Part 404, Subpart P, App. 1 listings 12.04 and 12.06. (Id.). The ALJ noted that she considered whether the "paragraph B" and "paragraph C" criteria for these disorders were met by plaintiff, apparently conceding that the "paragraph A" criteria were met. Plaintiff argues that he meets the "paragraph B" criteria.

"Paragraph B" criteria require that the disorder in question results in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (Tr. 30-31). Plaintiff argues that he meets the "B" criteria because Dr. Snyder found marked difficulty in maintaining activities of daily living and maintaining concentration, persistence, and pace.

Marked limitations in the activities of daily living are not defined "by a specific number of different activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function." The regulations continue to note that "we may still find that you have a marked limitation in your daily activities if you have serious difficulty performing them . . . in a suitable manner, or on a consistent, useful, routine basis, or without

undue interruptions or distractions." [20 C.F.R. Part 404](), Subpart P, App. 1 section 12.00.

The ALJ found that the plaintiff suffered from mild restrictions in activities of daily living and had moderate difficulties in the area of concentration, persistence, or pace. These conclusions and findings were based solely on the plaintiff's testimony. (TR. 30-31). Although addressed later in her findings, the ALJ gave little weight to Dr. Snyder's assessments in these same areas because they were inconsistent "with the claimants own contemporaneous self-reported level of functioning at home which includes caring for children, doing the shopping, laundry, and housework." (TR. 38). The ALJ went on to discuss how the plaintiff showed "noted improvement . . . with ongoing treatment." The ALJ then detailed eleven sessions that showed some positive mental developments. (TR. 35-36). The ALJ also briefly noted some other positive mental findings related to memory, speech, orientation, mood, affect, and attention. (TR. 36). However, these were findings in a few primary care notes, along with a single neurological follow-up.

It is unclear from the ALJ's opinion exactly how much weight she assigned Dr. Snyder's opinion. In one respect, she adopted Dr. Snyder's findings that the plaintiff suffered only moderate restrictions in terms of social functioning without any further discussion. (TR. 31). However, the ALJ then gave "little weight" to Dr. Snyder's contemporaneous opinions in the areas of daily living and concentration, persistence, and pace. (TR. 37).

In finding the plaintiff has mild restrictions in the his daily activities, the ALJ stated the plaintiff cares for his teenage children, drives every two weeks, does some shopping, and helps with the household chores. (TR. 30). Although the plaintiff reported driving to doctor's appointments every two weeks, he testified that he stopped helping with the chores around the same time he stopped working in June 2010. (TR. 61). Moreover, there is nothing to indicate how caring for two teenage children, who both attended high school and are active boy scouts, (TR. 62), would require significant contributions from the plaintiff. Further, in reviewing the hearing testimony, the court does not find any evidence that would indicate the plaintiff did any shopping or helped with the housework as of June 2010. Although he did discuss helping his sons with a boy scout project and a school assignment, these were not part of the record cited by the ALJ when she was determining whether the plaintiff satisfied the "paragraph B" criteria. (TR. 401, 413). These instances were also taken into account by Dr. Snyder as he made notes of them prior to making his disability determination.

Whereas the ALJ pointed to four minor activities of daily living to show mild restrictions, Dr. Snyder provided thirty pages of fairly detailed notes to support his diagnosis and evaluation. (TR. 393-413). Even though there is some improvement in his condition, the ALJ's selective discussion of these progress notes is insufficient to support her conclusion. She specifically cited good sessions in April and June 2011, without discussing the findings that

demonstrate weeks later the plaintiff battled with depression, poor sleep, hyper-vigilance, recurring tragic memories, poor thought processing, anxiety, feelings of being overwhelmed, venting, and frustration. (Tr. 399-401). The ALJ also pointed to sessions in September 2011 that showed some improvement, despite many of the findings that indicated ongoing family problems, depression, anxiety, and hostility toward his wife. (TR. 397-99). In sum, the court agrees with plaintiff that the ALJ "cherry picked" medical evidence to support a finding of not disabled, rather than reviewing and evaluating the objective medical evidence supporting Dr. Snyder's opinion. There is not substantial medical evidence of record to support the ALJ's finding that the plaintiff was only mildly restricted in his activities of daily living. Dr. Snyder's findings indicated marked limitations and should have been accorded great weight as an opinion of a treating physician. As such, the court finds the plaintiff was markedly limited in his activities of daily living.

Turning toward concentration, persistence, and pace, the ALJ cited the same evidence, along with the plaintiff's demeanor during the hearing, to find he had only moderate restrictions in this area. "Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." Moreover, the regulations call for the ALJ to evaluate the "nature and overall degree of interference with function," not merely the number of tasks the plaintiff can perform. 20 C.F.R. Part 404,

Subpart P, App. 1 section 12.00.

As discussed above, the hearing testimony cited by the ALJ is devoid of any indication that as of June 2010 the plaintiff assisted with the household chores or shopping. Moreover, assisting his sons with two different projects does not indicate how his mental state would interfere with his overall ability to function in a sustained work environment. The ALJ failed to evaluate the objective medical evidence and findings when rendering this determination. The evidence and conclusions of the ALJ were not based on "contradictory medical evidence." *Plummer*, 186 F.3d at 429. Rather, it was based on the ALJ's unsupported lay opinion about the plaintiff's ability based on sparse information taken, according to her decision, exclusively from the hearing testimony. (TR. 31). *See Morales*, 225 F.3d at 317 (holding an ALJ may not base his or her findings on lay opinion, speculation, or credibility determinations).

In contrast, Dr. Snyder found the plaintiff would have marked limitations with understanding and remembering simple and detailed instructions, carrying out detailed instructions, maintaining attention and concentration for two hours, keeping a schedule, sustaining an ordinary work routine, working in coordination with others, making simple work-related decisions, and completing a normal workweek without interruptions stemming from his psychological problems. (TR. 279-280). Although the report was created on June 2, 2011, (TR. 277), Dr. Snyder had been treating the plaintiff for nearly a year at that point and conducted forty-three sessions over that time span. (TR. 401-13).

The ALJ did not address any of these sessions and opted to focus on a few notes that showed improvement, without addressing the contemporaneous notes that showed the plaintiff continuing to struggle with his psychological impairments. (TR. 35-38). The court addressed the inadequacy of this type of "cherry picking" above. Further, the plaintiff's testimony confirmed this diagnosis. The plaintiff said that he has struggled to maintain a consistent work schedule between September 2001 and June 2010, required a cot in his office, took excessive sick and vacation time, and became unable to work as of June 2010. (TR. 53, 72-73).

The ALJ also assigned the plaintiff's GAF score of 35 "little weight." (TR. 37). GAF scores do not have a "direct correlation to the severity requirements" under SSA rules. *West v. Astrue*, 2010 WL 1659712, at *4 (Apr. 26, 2010 E.D. Pa.)(*quoting Watson v. Astrue*, 2009 WL 678717, at *5 (Mar. 13, 2009 E.D. Pa*))(*quoting* 66 Fed.Reg. 50746, 50765-65 (2000)). However, "a GAF score constitutes medical evidence accepted and relied upon by a medical source and *must* be addressed by an ALJ in making a determination regarding a claimant's disability." *Colon v. Barnhardt*, 424 F.Supp. 2d 805, 812 (E.D Pa. 2006); *Joseph v. Astrue*, 2012 WL 4459796, at *8 (Apr. 26, 2012 E.D. Pa.)(GAF scores can impact whether a plaintiff meets listed impairments). GAF scores of 50 and below indicate serious or major impairments with functioning, including inability to maintain social functioning and inability to maintain employment. *See* Am. Psych. Assoc., Diagnostic & Statistical Manual of Mental

23

Disorders 34 (2000). The ALJ mentioned the GAF score briefly, but gave it little weight given it "fails to take into account the [plaintiff's] improvement with treatment" and should be evaluated in light of the record as a whole. The evidence of record discussed above demonstrates that plaintiff has a marked limitation in maintaining consistency, persistence, and pace. The GAF is consistent with these findings. The ALJ improperly weighed and essentially ignored this relevant medical evidence.

The ALJ's step 3 decision discussed the different regulations she applied, the "B" and "C" criteria she considered, and some of evidence from the record. However, much of the evidence of record which demonstrates the severity of plaintiff's impairments seems to have been disregarded at this step, and the ALJ did not explain how or whether she discounted that evidence at step 3. Accordingly, the court is not satisfied that substantial evidence supports the ALJ's determination that plaintiff's impairments do not meet the requirements of 20 C.F.R. Part 404, Subpart P, App. 1 listings 12.04B and 12.06B. The court finds that plaintiff has marked limitations in activities of daily living and concentration, persistence, and pace. Therefore, his impairments meet the severity requirements of the regulations.

Finding that plaintiff's impairments meet the listings at step 3 "results in a finding of disability*." Cruz v. Commission of Social Sec.*, 244 F.App'x 475, 480 (3d Cir. 2007)(citations omitted). Thus, the analysis ends at step 3, and the court need not consider plaintiff's other arguments for relief. Plaintiff's request

for DIB is granted.

## VII.   CONCLUSION

Based on the foregoing, the plaintiff's appeal of the decision of the Commissioner of Social Security, (Doc. No. 1), is **GRANTED**, the decision of the Commissioner is **REVERSED**, and the Commissioner is directed to award plaintiff disability insurance benefits. A separate order shall issue.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date: May 15, 2014**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2012 MEMORANDA\12-2438-01.HHS.wpd